UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09-cr-10017-GAO |
| | ) | |
| TAREK MEHANNA, | ) | **Oral Argument** |
| | ) | **Requested;** |
| Defendant. | ) | **Leave to File Granted** |
| | ) | **September 15, 2015** |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
TAREK MEHANNA'S MOTION UNDER 28 U.S.C. § 2255
TO VACATE SENTENCE OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

Last year, in a prosecution in the District of Connecticut,[1] the government disclosed over 600 pages of classified information concerning Evan Kohlmann, conceding that the material fell within the purview of *United States v. Giglio*, 405 U.S. 150 (1972). The government then withdrew Kohlmann as an expert witness and withdrew his expert report. Since February 2014, the government has disclosed this information in at least four prosecutions handled by three different United States Attorneys' offices.

This information was never disclosed to Tarek Mehanna's trial counsel (and as far as counsel is aware, this Court) at Mehanna's 2011 trial, in which Kohlmann was the government's star witness.

A preeminent defense attorney[2] who has seen the classified material attests that it is "essential to any cross-examination of Mr. Kohlmann," that it is "extraordinarily material to such

---

[1] *United States v. Ahmad*, No. 3:04CR301 (JCH) (D. Conn.).

[2] Joshua Dratel, Esq. is perhaps the leading defense lawyer now acting for defendants in United States terrorism prosecutions. He was counsel in *United States v. Mostafa*, No. 1:04-CR-00356 (KBF) (S.D.N.Y.) and in *Ahmad*, cases in which the government disclosed this information, conceding that it contained *Giglio* material. September 25, 2015 Declaration of Joshua L. Dratel ("Dratel Decl."), ¶¶ 7, 9–10; *see Ahmad*, Dkt. No. 199 (attached as Exhibit A).

cross-examination," and that it "unquestionably qualifies as material covered by *Giglio*." Dratel Decl. ¶ 15. After reviewing Kohlmann's testimony in dozens of prior cases, including Mehanna's, he reports that Kohlmann has testified in a misleading or false manner concerning this classified information. *Id.* at ¶ 21. Specifically with respect to Mehanna's trial, he attests that "[o]n direct examination, Mr. Kohlmann provided answers that were in direct conflict with the [classified] Information. Those answers were, in my opinion, false, and deliberately designed to mislead both the jury and the Court (if not the prosecutor as well)." *Id.* at ¶ 24.

Pursuant to 28 U.S.C. § 2255, Mehanna now seeks, in the first instance, access to (a) the classified material, which according to the government, includes a cover letter that "summarize[s] certain information falling within the purview of *United States v. Giglio*," *Ahmad*, Dkt. No. 199 at 2 (Exhibit A); and (b) the related litigation materials (also classified) from the *Mostafa* case that are described at Dratel Decl. ¶¶ 20–23. The related litigation material includes a catalog of "instances in which Mr. Kohlmann's prior testimony was misleading and/or simply false" concerning the Kohlmann Information. *Id.* at ¶ 20. Access to the related material, which is available to the government, will greatly assist review in this Court, particularly given the burdensome nature of working within a Sensitive Compartmented Information Facility ("SCIF"). The relevant litigation materials are housed in the same location as the original *Giglio* material, in a SCIF located in New York City, and have already been transcribed in preparation for appeal. *Id.* at ¶ 22.[3]

Mehanna requests that the Court schedule conferences under 28 U.S.C. § 2255(b) and 18 U.S.C. App. 3 § 2; order disclosure of the Kohlmann Information to Mehanna's attorneys; allow such further discovery as may then be warranted; grant leave for Mehanna to submit a classified amendment; vacate and set aside the judgment; and order a new trial.

---

[3] Lead counsel on this motion formerly held a secret clearance. Mehanna's attorneys will work with the government to obtain required clearances for Mehanna's drafting team, and to prepare an appropriate joint protective order to ensure that the classified nature of all classified materials is protected.

I.     **PROCEDURAL HISTORY**

Mehanna was charged on November 10, 2008 with making false statements to the FBI. Dkt. No. 1, 4.  The government filed a Superseding Indictment on November 5, 2009.  Dkt. No. 38.  On June 17, 2010, a grand jury returned a Second Superseding Indictment, charging Mehanna with seven offenses.  Dkt. No. 83.

Count I charged Mehanna with conspiring, beginning in 2001, to provide material support to al Qa'ida by translating and disseminating materials and in connection with his 2004 visit to Yemen, in violation of 18 U.S.C. § 2339B.  *Id.* at 1–10.  Counts II and III charged Mehanna with conspiracy and attempt in connection with the same activities, in violation of 18 U.S.C. § 2339A (predicated upon 18 U.S.C. §§ 956, 2332).  *Id.* at 11–19.  Count IV charged Mehanna with violating 18 U.S.C. § 956.  *Id.* at 20–22.  Counts V–VII charged Mehanna with conspiracy to make false statements as part of a conspiracy to commit an offense against the United States and knowingly and willfully making false statements to the FBI, in violation of 18 U.S.C. §§ 371, 1001(a)(2).  *Id.* at 20–29.  On July 20, 2010, Mehanna pleaded not guilty to all counts.

Mehanna was tried before a jury from October 27, 2011 to December 20, 2011.  He did not testify.  On December 20, 2011, the jury returned guilty verdicts on all counts.  Dkt. No. 422. On April 13, 2012, the Court sentenced Mehanna to 210 months imprisonment and seven years of supervised release.  Dkt. No. 432.

Mehanna appealed on December 17, 2012, challenging his conviction on the grounds that it rested on protected speech; that inflammatory evidence and spillover prejudiced the entire trial; that his expert witnesses were improperly excluded; that some of the government's theories were legally impossible; that the government could not prove the materiality of certain false statements; and, in the alternative, that he was entitled to a new sentencing.  Br. of Def.-Appellant at 22–71, *United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013) (No. 12–1461).  The Court of Appeals affirmed his conviction on November 13, 2013, and denied his motion for rehearing on December 17, 2013.

On March 17, 2014, Mehanna petitioned for a writ of *certiorari*, asserting that the lower

courts had misapplied the holding of *Holder v. Humanitarian Law Project* to Counts I–III in violation of his First and Fifth Amendment rights.  Br. of Pet'r at 6–23, *United States v. Mehanna*, 135 S.Ct. 49 (2014) (No. 13–1125).  The Supreme Court denied *certiorari* on October 6, 2014.

Mehanna has filed no other appeals of the judgment.  This is his first motion under 28 U.S.C. § 2255.  Today he is confined at the United States Prison at Marion, Illinois.  His prisoner number is 05315-748.

## II.     FACTS

The "core of this case," the government told the jury, was Mehanna's "conspiracy and his agreement" to provide material support "for al Qa'ida" and then "lying to the FBI about it[.]"  Dkt. No. 386, 61:3–6 (Gov. Opening).  The government's case involved, on the one hand, a mass of translation and speech, and on the other, a visit Mehanna paid to Yemen.  *Id.* at 29:7–31:23 ("There were two principal ways in which the defendant conspired to and tried to provide material support to the terrorists. … [H]e went over to Yemen for the purposes of getting terrorist training … and he started acting to help al Qa'ida on the Internet" by way of a "translation service that he offered.").  The government presented the two aspects of its case as part of a unified conspiracy, Dkt. No. 419, 40:18–21 (Gov. Closing) ("The charges are all related to each other … the evidence proving these charges overlaps"), and submitted the material support counts on a general verdict, under which either aspect might suffice to persuade the jury, Dkt. No. 422.  The government stitched the two themes together, arguing that Mehanna began translating for al Qa'ida *because* he failed in his mission to join it in Yemen.  Dkt. No. 386, 32:11–15 (Gov. Opening) (Mehanna's translations were intended to instruct others "on how somebody can get ready to personally get into the fight. ... And after he failed in being able to do that himself over in Yemen, he wanted other people to do what he could not."); Dkt. No. 419, 65:11–14 (Gov. Closing).

By linking the two aspects of its case, the government made Kohlmann its foundational witness for both.  On its speech theory, the government argued that Mehanna and other users of a website called Tibyan Publications conspired to provide a service to al Qa'ida by translating its

propaganda. Dkt. No. 419, 69:7–9 (Gov. Closing). The defense argued that Mehanna translated independently, and therefore that his translations were protected speech. *Id.* at 137:11–23 (Def. Closing). Kohlmann's opinions provided the only connection between the website and al Qa'ida, and thereby the only basis for criminal liability on this theory. *See* Part III. D. 1, *infra* at 11–18. As far as the trip to Yemen, the issue for the jury was not what happened, *see* Tr. Ex. 795 (stipulation), but Mehanna's intent in traveling.[4] In promoting its view of Mehanna's state of mind—the *only* jury question on the Yemen theory—the government relied on Kohlmann's opinions to argue that Mehanna was al Qa'ida's agent, who translated its propaganda, including an al Qa'ida terrorist training manual, recruited local Muslims on behalf of al Qa'ida, and discussed preparations for an al Qa'ida suicide bombing. *See* Part III. D. 2–3, *infra* at 18–22.

Two of the three false statements charges stemmed directly from Mehanna's intent in traveling: that he conspired to cover it up, and that he misrepresented to the government his reasons for going to Yemen. Dkt. No. 419, 37:7–38:9, 38:15–20 (Gov. Closing). A third false statements charge concerned his statements to the FBI regarding a friend's location. *Id.* at 38:11–14.

## III.   ARGUMENT

### A.   Standard of Review.

Under 28 U.S.C. § 2255(a), a prisoner in federal custody may file a motion "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution[.]" Unless the record shows "conclusively" that he "is entitled to no relief, the court shall … grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law[.]" *Id.* at § 2255(b). If the Court finds that there has been "a denial or infringement of the constitutional rights of the prisoner … the court shall vacate and set the judgment aside and shall

---

[4] The government argued that Mehanna conspired with others to find an al Qa'ida training camp, and then to go on to fight against American forces in Iraq. Dkt. No. 419, 46:16–20 (Gov. Closing). The defense argued that he went in search of education at Yemen's world-renowned religious schools. *Id.* at 113:16–114:7 (Def. Closing).

discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." *Id.*

**B.** *Giglio* **and the Remedy for Non-Disclosure.**

The Fifth Amendment requires the government to produce evidence favorable to the accused that is "material either to guilt or punishment[.]" *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "The evidence at issue must be favorable to the accused, either because it is exculpatory, *or because it is impeaching*; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *United States v. Aviles-Colon*, 536 F.3d 1, 19 (1st Cir. 2008) (quoting *Strickler v. Greene,* 527 U.S. 263, 281–82 (1999)) (emphasis added). "[E]vidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433–434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)).[5] "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal[.]" *Id.* at 434.

At trial, the case went to the jury on a general verdict, and the verdict was affirmed on sufficiency grounds. *Mehanna*, 735 F.3d at 46, 55, 69. The test now "is *not* a sufficiency of the evidence test," *Conley v. United States*, 415 F.3d 183, 189 (1st Cir. 2005) (quoting *Strickler*, 527 U.S. at 290), but whether the government's evidentiary suppression "undermines confidence in the outcome of the trial," *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). This is a question that courts evaluate "in the context of the entire record." *Conley,* 415 F.3d at 189 (citing *Bagley*, 473 U.S. at 683).

Here, the suppression of impeachment evidence concerning the government's key wit-

---

[5] "Despite our repeated explanation of the shorthand formulation [of 'reasonable probability'], the continued use of the term 'probability' raises an unjustifiable risk of misleading courts into treating it as akin to the more demanding standard, 'more likely than not.'" *Strickler*, 527 U.S. at 298 (Souter, J., concurring).

ness certainly had a material impact on the integrity of the entire trial, for it was Kohlmann who stitched together the government's unified conspiracy theory, and Kohlmann who enabled the government to turn protected speech into evidence of crime. Kohlmann's testimony colored everything else; it was so central to the government's case that it is impossible to postulate any result in the case without it.

Impeachment evidence is particularly significant where it concerns an expert. *See United States v. Rosales*, 19 F.3d 763, 766 (1st Cir. 1994) ("[W]e have recognized that 'proffered expert testimony [c]ould create a substantial danger of undue prejudice … because of its aura of special reliability and trustworthiness.'") (second alteration in original) (quoting *United States v. Fosher*, 590 F.2d 381, 383 (1st Cir. 1979)). When a jury is asked to accept opinions on matters outside ordinary knowledge, evidence of the bias of the expert may well be crucial to its assessment. *See United States v. Brown*, 776 F.2d 397, 401 (2d Cir. 1985) ("The aura of special reliability and trustworthiness surrounding expert testimony … especially when offered by the prosecution in criminal cases, poses a special risk … when the opinion is given by" investigating officers) (internal quotation marks omitted) (citations omitted).

The jury's estimate of Kohlmann's truthfulness and reliability did not simply concern an expert, nor even the government's star witness. *See Conley*, 415 F.3d at 189 ("[T]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence.") (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). Kohlmann's testimony formed the basis of a constitutional finding. Resting on his opinions, the government successfully argued that an American's religious and political speech forfeited First Amendment protection. It was of the highest importance that the process by which his testimony reached the Court and the jury be untainted. Unfortunately, the government itself has already found that the taint was serious.

The remedy for a *Brady* violation is a new trial. *Giglio,* 405 U.S. at 155. This is true "irrespective of the good faith or bad faith of the prosecution," *id.* at 153 (quoting *Brady*, 373 U.S. at 87), and even where the "evidence [is] 'known only to police investigators and not to the pros-

ecutor.'" *Strickler*, 527 U.S. at 280–81 (quoting *Kyles*, 514 U.S. at 438).

> **C.    The Government Has Admitted in Other Cases Where It Offered Kohlmann As an Expert That Disclosure of the Classified Information is Constitutionally Mandated.**

Although Kohlmann has testified for the prosecution in dozens of cases over the last decade, the government did not disclose certain *Giglio* material regarding Kohlmann (the "Kohlmann Information") in any case until 2014.  Dratel Decl. ¶ 12.  In July 2014,[6] in *Ahmad*, the government disclosed the Kohlmann Information a week before a sentencing hearing at which Kohlmann was to testify.[7]  *See id.* at ¶ 10; Exhibit B (*Ahmad*, Dkt. No. 195) (defense motion to preclude Kohlmann testimony); Exhibit C (*Ahmad*, Dkt. No. 171) (demonstrating Kohlmann was the witness at issue).  The government acknowledged that the withheld material included "*certain information falling within the purview of United States v. Giglio*," Exhibit A (*Ahmad*, Dkt. No. 199) (government response) at 2 (emphasis added), adding that:

- the late disclosure was "an issue of the government's creation;"

- the government "ha[d] erred … in not providing this particular material earlier;"

- the government "accept[ed] responsibility for this issue and [was] prepared not to call the witness;" and that

- the late disclosure was "the government's mistake, for which the government bears responsibility, and for which the government [wa]s prepared to accept whatever remedy the Court believe[d] appropriate."

*Id.* at 1–2.  The government ultimately withdrew Kohlmann as a witness and withdrew his expert report.  Dratel Decl. ¶ 10.  The government disclosed the Kohlmann Information in at least two other cases in 2014, *Abu Ghayth* and *Mostafa*, and in at least one more case in 2015, *United*

---

[6] The government first disclosed the *Giglio* material concerning Kohlmann in early 2014 in *United States v. Abu Ghayth*, No. 98-cr-1023 (LAK) (S.D.N.Y.).  Dratel Decl. ¶ 11.

[7] Because defendant pleaded guilty, the issue of a new trial did not arise in that case.  Kohlmann was to testify in the sentencing phase before the *Giglio* issue caused the government to withdraw him as a witness.

*States v. Hasbajrami*, No. 1:11-cr-00623-JG-1 (E.D.N.Y.).  Dratel Decl. ¶¶ 9–13.[8]

   *Ahmad* is remarkable not only because of the government's admissions, but because of the case's similarity to Mehanna's case.  Portions of the *Ahmad* indictment were admitted in evidence at Mehanna's trial.  Tr. Ex. 71–75, 77–82, 90.  In both cases, the government relied on the defendants' links to British "Jihadi" websites.  Defendants in *Ahmad* were charged with "operat[ing] and maintain[ing]" Azzam Publications, a "family of websites," Tr. Ex. 74, 80; Mehanna was charged with posting translations on another British-based website, Tibyan Publications, Dkt. No. 419, 75:13–76:10 (Gov. Closing)**.**  In this Court, the government explained that Mehanna's "online activities, recruiting, using jihad videos" were "*what Azzam Publications was doing*."  Dkt. No. 402, 109:18–23 (Gov.).  Yet in *Ahmad*, the government withdrew Kohlmann as an expert witness after disclosing the *Giglio* information that Mehanna now seeks.  *See* Dratel Decl. ¶ 10.

   In short, the government's admissions establish two core elements of Mehanna's *Brady* claim: the *government* concedes both that it withheld evidence, and that the evidence was favorable to the accused.  *See* Exhibit A; *Aviles-Colon*, 539 F.3d at 19 (the first two elements of a *Brady* claim are that the "evidence at issue must be favorable to the accused" and "that evidence must have been suppressed by the State") (quoting *Strickler*, 527 U.S. at 281–82).

   **D.    The Government's Failure to Disclose the Kohlmann Information Materially Prejudiced the Defense.**

   In this Court, the government presented Kohlmann as profoundly knowledgeable and unimpeachably independent.  He had testified before Congress, advised a national television news program, consulted to the nonprofit group, "Nine/Eleven Finding Answers," and as an author had been cited by the Bipartisan Congressional 9-11 Commission.  Dkt. No. 409, 101:24–25, 102:2–4, 102:20–103:18, 105:23–25.  The jury heard that he was a scholar of terrorism who maintained "a complete database of virtually every single message that has been posted" since 2006 on "eve-

---

[8] There may well be more cases in which the government has disclosed the Kohlmann Information; most of the litigation concerning this issue is filed under seal.

ry single online forum used by individuals who are violent extremists" as well as a "library of documents and data … approximately three or four terabytes in size" that "contain[ed] records of virtually every single video recording issued by al Qa'ida or other Jihadi movements, every single magazine, every single communique, every single official statement," which he "collected [] personally." *Id.* at 97:15–22, 99:9–25. Here, the jury was led to believe, was an expert upon whose knowledge and independence it might rest a fair verdict. The jury did not know the *Giglio* information the government later determined it was constitutionally obligated to provide.

Kohlmann's "trial testimony was the centerpiece" of the government's case. *See Banks v. Dretke*, 540 U.S. 668, 701 (2004) (finding prejudice under *Brady* where government withheld impeachment evidence concerning its key witness). His role was to "explain[] the significance" of the evidence and of "individuals, particular files, … [and] certain activities, such as in this case, translating"—in other words, he explained how the evidence demonstrated criminal activity within the framework of al Qa'ida's global operations.[9] Dkt. No. 408, 142:23–143:2 (Gov.). He was the government's closer: he testified last, and over the course of three days, tied the government's case together, commenting on virtually every aspect of the case, from the membership in the conspiracy, to Mehanna's knowledge of the conspiracy, to the meaning of Mehanna's words and his state of mind. In a case "about the defendant providing material support to al Qa'ida," Dkt. No. 409, 81:19–20 (Gov.), Kohlmann provided the *only link* to al Qa'ida. The prosecution referred to him by name *twelve times* during its closing arguments. Dkt. No. 419, 44:15, 66:2–3, 68:25, 69:2, 69:7, 75:17, 75:19, 75:24, 144:8, 144:12, 145:24, 146:13. He provided testimony on the meaning and context of *forty-nine* different exhibits—including *39 Ways to Serve and Participate in Jihad* and *Umar Hadid*, the two translations central to the case—much of which was either uncorroborated or contradicted by other witnesses.

---

[9] Not only did Kohlmann explain the significance of the prosecution's evidence, he helped shape the prosecution in the first place. The government provided Kohlmann with a copy of Mehanna's hard drive and asked him to "produce an assessment of … the significance of the material that [he] found on that hard drive." Dkt. No. 409, 112:14–19; *see id.* at 113:9–17 (his role was to "assess the significance of [Mehanna's hard drive], the relevance of that material, and [] attempt to identify what it is.").

So central was he that, as Mehanna's experienced trial team explained, "*all* of our defense" was "based on what Kohlmann was going to say." Dkt. No. 413, 14:15–16; Dkt. No. 414, 22:2–3. The integrity of the jury's verdict therefore depended upon "the jury's estimate of [his] truthfulness and reliability." *Conley*, 415 F.3d at 189. A full analysis is not possible without review of the Kohlmann Information, but the Dratel affidavit shows more than "a reasonable probability that, had [it] been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 434.

>       1.       **Kohlmann Provided the Basis of the Translation Theory of Guilt and the Only Evidence of Mehanna's "Coordination" with Al Qa'ida.**

The government charged Mehanna with providing material support under 28 U.S.C. §§ 2339A, 2339B. Material support in the form of a service falls within the statutes' prohibition when it is "performed in coordination with, or at the direction of" terrorists. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 24 (2010) ("*HLP*"). The government conceded that Mehanna "was not instructed by al-Qaeda." Dkt. No. 165, 39:5–6. Guilt on the material support counts therefore turned on "coordination,"[10] and Kohlmann provided critical evidence of Mehanna's "coordination" with al Qa'ida. Kohlmann's testimony alone turned Mehanna's protected speech into criminal conduct.

Mehanna was an avid translator, but to make out its coordination case, the government faced a considerable challenge: it needed to show that Mehanna intended to translate *for al Qa'ida*. It had no evidence that Mehanna or any other Tibyan user provided *any* translation requested by al Qa'ida. The key translations upon which it relied were materials that no one requested. Without the aid of its expert, the government could not show that Mehanna knowingly provided material support to al Qa'ida, or even that a Tibyan/al Qa'ida conspiracy existed.

---

[10] *See* Dkt. No. 419, 24:3–22 (Count I instruction) ("for a person to be guilty under this count, [he] must be acting in coordination with or at the direction of a designated foreign terrorist organization, here, … al Qa'ida."); *id.* at 26:14–17, 28:10–12 (Count II); *id.* at 30:18–31:2 (Count III). Guilt on Count I depended on coordination *with al Qa'ida*; the government's main theory on all three counts concerned coordination with al Qa'ida. *See* Dkt. No. 386, 61:3–6 (Gov. Opening).

a.      *Kohlmann Alone Testified That Tibyan Was an Al-Qa'ida Website.*

Kohlmann testified that "Al Qa'ida relies" on its "media wings [which] are responsible for producing video recordings, magazines, communiques and other material that is then disseminated out via the internet." Dkt. No. 410, 4:16–5:1. He described "a coordinated process" that operates through "particular social networking sites on the internet which are responsible for distributing this material." *Id.* at 5:1–4. Translations in particular are "essential" to al Qa'ida's recruitment, he said, noting that its "media wings" solicit recruits and financing through "password-protected web forums." *Id.* at 10:17–12:3, 14:24–15:5. [11] He opined that Tibyan was such a web forum. *Id.* at 31:20–22.

*Kohlmann alone* explained that the materials translated and posted on Tibyan came from al Qa'ida.[12] *See* Dkt. No. 419, 69:1–3 (Gov. Closing) ("Pippin testified that most of the materials being translated [on Tibyan] were coming from two websites, and Evan Kohlmann identified those two al Qa'ida websites."[13]). *Kohlmann alone* testified that al Qa'ida reposted translations supplied by Tibyan. Dkt. No. 411, 115:24–116:1 ("At-Tibyan material was being posted all over the place. Material from the at-Tibyan forum was being reposted on the Muntada Al Ansar forum[.]").

The government's summation echoed Kohlmann's testimony. "Kohlmann testified that Tibyan came to the attention of al Qa'ida, and they thereafter *coordinated* with al Qa'ida." Dkt. No. 419, 69:7–9 (Gov. Closing). Mehanna was "part of the media wing," *id.* at 76:6–10, and was "involved in recruitment" for al Qa'ida "through the internet," *id.* at 68:15–17. His "editing and

---

[11] Kohlmann opined that al Qa'ida and other terrorist groups "have specifically and repeatedly solicited" translations. Dkt. No. 410, 107:13–16. "Without that there's no way for these groups to have [] effective recruitment[.]" *Id.* at 107:2–5.

[12] Unless coordinated with al Qa'ida, these activities were unquestionably protected speech. *HLP*, 561 U.S. at 39 ("[W]e in no way suggest that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations."); 28 U.S.C. § 2339B(h) (exempting independent speech).

[13] Only Kohlmann identified these websites as al Qa'ida websites.

translating and distributing" work was an effort "to provide al Qa'ida more material for further recruiting." *Id.* at 66:14–15, 76:7–11.  *See also* Dkt. No. 386, 46:7–9 (Gov. Opening) ("The website became a virtual conference room where he and others who had agreed to help support al Qa'ida and terrorists could gather on the Internet."); *id.* at 45:21–23 (Tibyan was "the website through which the defendant distributed many of the things that he translated for al Qa'ida."). No other witness provided a source for these arguments.

> b.      *Kohlmann Established the "Coordination" Between Tibyan Users and al Qa'ida.*

Kohlmann was the only witness to connect Tibyan users to al Qa'ida.  He opined broadly that "al Qa'ida coordinate[d] with Tibyan Publications" starting "in early 2005" by "making contact with individuals at at-Tibyan through online social networking sites in which they explained that they wished at-Tibyan's help in translating materials into English[.]"  Dkt. No. 410, 31:20–32:7.  The only individual whom Kohlmann or the government said al Qa'ida contacted was Younis Tsouli.  *See* Dkt. No. 419, 72:23–73:7, 74:17–22 (Gov. Closing); Dkt. No. 395, 80:21–23 (Gov.) ("Tsouli was this facilitator who would take videos and make it accessible and ultimately get it to … [Tibyan's] steno pool, the translation pool.").  Kohlmann described Tsouli as "a central hub … to make contact with al Qa'ida on the internet."  Dkt. No. 410, 33:13–15; *id.* at 34:3–5 ("Mr. Tsouli, in fact, became a hub, not just for al Qa'ida in Iraq's communications, but also their actual physical recruitment of fighters.").[14]  He referred to an August 2005 chat transcript in which Tsouli appeared to forward a request for an al Qa'ida translation to Waseem Mughal.  *See* Tr. Ex. 378; Dkt. No. 395, 98:24–99:18.  Kohlmann opined that Tsouli was working with both al Qa'ida and Tibyan, and this chat showed how they coordinated.  Dkt. No. 410, 33:1–6.

There was no evidence that Mehanna ever communicated with Tsouli or Mughal, nor that the Tsouli/Mughal chat ever reached Mehanna, nor even that the requested material was ever translated.  There was no evidence that Tsouli or Mughal made any other request of any Tibyan

---

[14] Defense expert Dr. Marc Sageman explained instead that Tsouli worked independently on the internet and "al Qa'ida piggybacked on that around 2004, 2005."  Dkt. No. 417, 80:11–14.

user.[15]   Kohlmann's opinion was the centerpiece of the government's asserted conspiracy link between Tsouli/Mughal and Tibyan users.  Seizing on that opinion, the government argued that Mehanna was part of Tibyan's "steno pool."  Dkt. No. 395, 74:6–12 (Gov.) (arguing the Tsouli chat, Tr. Ex. 378, was relevant because "that conversation took place after—it's like … let's send something to the steno pool and the defendant is in that steno pool.  The defendant had already, again, joined Tibyan as a translator, agreed to be a translator, and now these individuals are stating, Let's ask the TP translators to translate a particular project."); *see id.* at 80:21–23; Dkt. No. 419, 68:15–21, 76:6–10 (Gov. Closing).

While Mehanna spoke frequently on Tibyan, the government offered no evidence that *any* translation posted by him or *any* Tibyan user was requested by al Qa'ida, Tsouli, or Mughal. Kohlmann's testimony alone stitched this speech into a conspiracy to provide a "service" to al Qa'ida.  His opinion allowed the government to broaden the scope of its conspiracy theory to include *any Tibyan user*, regardless of whether he received instructions or had knowledge of a criminal scheme.  Without Kohlmann, the government could not prove that Mehanna's (or any Tibyan user's) translations were anything other than independent speech.  *See HLP*, 561 U.S. at 39.

   c.   *Kohlmann Provided the Only Evidence that Mehanna Knowingly Conspired with Al Qa'ida to Translate Documents.*

The next step was for Kohlmann to characterize Mehanna's links to Tibyan.  Without Kohlmann, the government's chronology could not show that Mehanna intended to service al Qa'ida through his translations.  The government pointed first to Mehanna's acceptance of Sadequee's April 4, 2005 invitation to translate books with Tibyan users.  Dkt. No. 419, 73:8–10 (Gov. Closing) ("And then the floodgates opened"); *see* Tr. Ex. 414, Tr. Ex. 411.  The invitation

---

[15] The government captured the *entire* Tibyan website database, and over *700 gigabytes* of data from *nineteen* forensic images of different computer hard drives and other media.  It had Tsouli's hard drive, Mughal's hard drive, and Mehanna's hard drive, and yet it offered not a single communication between Tsouli *or* Mughal and *anybody else.*

contained no reference to al Qa'ida.[16]   Tr. Ex. 414.   On April 7, Mehanna emailed Sadequee a partial translation of one of the projects suggested in the invitation.   Tr. Ex. 253.   This was the *only* translation Mehanna ever supplied at *anyone*'s request.   *Compare* Tr. Ex. 253 *with* Tr. Ex. 414.   Soon after, Mehanna emailed *Such Are the Messengers Tested*, as well as half a dozen other translations during the Spring and Summer of 2005—none of which were requested by anyone.   Tr. Exs. 248, 249, 250, 252, 255, 412, 413, 416, 417, 418.   By early October 2005, Mehanna had posted the first 23 of the *39 Ways to Serve and Participate in Jihad*, a cornerstone of the government's case.   Tr. Ex. 416, 418.   Aside from the balance of that document, and the later *Umar Hadid* video, all of the files the government accused him of translating were complete.

The only evidence the government could muster to show coordination in any of this translation activity was Kohlmann's opinion.   Kohlmann opined generally that "al Qa'ida coordinate[d] with Tibyan," Dkt. No. 410, 31:20–22, and specifically that *Such Are the Messengers Tested* was translated "in coordination with al Qa'ida," *id.* at 47:15–21.   This testimony allowed the government to argue that all of the translation activity that followed Sadequee's invitation was coordinated with al Qai'da.   *See* Dkt. No. 419, 73:18–21, 74:9–12 (Gov. Closing) (arguing Mehanna worked on *Messengers*, which was "released by Tibyan on behalf of al Qa'ida.").   Kohlmann was the only witness to make this connection; indeed, his opinion was the only basis from which the jury might have inferred that Mehanna was even aware of a link between Tibyan users and al Qa'ida during this period.   The government placed great weight on Kohlmann's opinion, arguing that the summer's translation work was for al Qa'ida, *id.* at 72:19–74:17, 75:13–21 (Gov. Closing), and that Mehanna's partial translation suggested by Sadequee's invitation was "evidence of his desire and intent and agreement to support al Qa'ida," *id.* at 73:11–17.

The next piece of "coordination" messaging upon which the government relied occurred on October 10, 2005, when Abu Mahmoud al-Muraabit sent Mehanna a message saying "the ikhwaan from the cloud people are asking us if we can translate this msg from the al doctoor re-

---

[16] The invitation suggested translation of "standard literature in the Salafi-Jihadi movement articulating different views[.]"   Dkt. No. 399, 81:2–4 (Pippin).

- 15 -

garding curryland."[17]  Tr. Ex. 427.  Mehanna never responded to this message, and did not trans-late the "msg."  A reasonable jury could have concluded that Mehanna's failure to respond to the request *contradicted* coordination, but Kohlmann's opinion again gave the government a basis to argue that it was "direct evidence of Mehanna's agreement to provide support to al Qa'ida." Dkt. No. 419, 75:11–12 (Gov. Closing).  Only Kohlmann's testimony turned a request for a translation that Mehanna never provided into evidence of a conspiracy to provide material sup-port to al Qa'ida.

What followed October was not a translation of "the doctoor's msg," but rather Mehan-na's alleged translation, in early 2006, of a video that was by then widely available, *Umar Hadid*. There was no evidence that anyone requested the translation.  To forge a link to al Qa'ida, the government again turned to Kohlmann, who said that Tibyan translated the video "in coordina-tion with al Qa'ida," Dkt. No. 410, 47:15–21, and offered the critical opinion that Mehanna re-ceived the original video before al Qa'ida publicly released it, *id.* at 38:1–8; *see* Tr. Ex. 415.  No other witness corroborated this opinion.  Embracing Kohlmann alone, the government argued that Mehanna's access to "the as-yet unreleased original Arabic version" of the video proved an insider connection to al Qa'ida.  Dkt. No. 419, 74:23–75:5 (Gov. Closing).  Kohlmann also opined that the provenance of the Tibyan-translated version of *Umar Hadid* was proved by an al Qa'ida "watermark" appearing in parts of the video and by the video's "title screen."  Dkt. No. 410, 20:1–21, 22:21–23:2; Tr. Ex. 92 (watermark); Tr. Ex. 26 (video); Dkt. No. 410, 22:8–20, 23:21–24.  No other witness corroborated that testimony either.  The government returned to this opinion in closing arguing that Mehanna worked on a video "produced by al Qa'ida."  Dkt. No. 419, 145:7–8 (Gov. Closing).  Relying on Kohlmann, the Government concluded, "*that means that the defendant knows that he is coordinating with al Qa'ida*[.]"  *Id.* at 145:6–10.

In short, the government's coordination-through-translation case hinged on the jury's as-sessment of Kohlmann's expertise and credibility.  Examining what otherwise would have been

---

[17] Absent independent evidence of a Tibyan conspiracy—here provided only by Kohlmann—the exhibit was hearsay.  Muraabit did not testify at trial.

protected speech, the jury could have found Mehanna guilty on Counts I–III based solely on Kohlmann's testimony.

       d.     *Kohlmann Testified that 39 Ways Was an Al Qa'ida Terrorist Manual Rather Than a Mainstream Religious Text.*

In its closing, the government argued that Mehanna translated *39 Ways* because of, as "Evan Kohlmann explained[,] the importance of the media effort to al Qa'ida organizations." Dkt. No. 419, 75:16–18; *see id.* at 150:7–12 ("That's the work that he was doing that he felt was making a difference in the war[.]").  It told the jury that *39 Ways* was "essentially a training manual on how somebody can get ready to personally get into the fight."  Dkt. No. 386, 32:11–12 (Gov. Opening).

Kohlmann testified that *39 Ways* "was meant to be a training manual or a rough instructional guide for individuals who are not in direct contact with al Qa'ida, in other words, people that are self-recruiting, that are self-radicalizing, people that would like to be part of this movement but simply don't have the means to make contact directly with the organization."  Dkt. No. 410, 46:3–10.  He called it "one of the most well-known training manuals that are out there[.]" *Id.* at 46:15–20.  "It is an official document produced by al Qa'ida."  *Id.* at 46:19.  No other witness confirmed this testimony, while defense witnesses directly contradicted it.  Dkt. No. 417, 86:17–21 (Sageman); Dkt. No. 414, 53:15–54:7, 54:16–19 (Fadel) (explaining that *39 Ways* is a religious document that contains "at least 40 verses of the Qur'an … and 42 Hadiths of the prophet," religious teachings that "any reasonably literate Muslim would have come across in his or her religious education.").  Neither the original Arabic version of *39 Ways* nor the translated version contains any reference to al Qa'ida.  Dkt. No. 414, 53:4–7; Tr. Ex. 25.

The material support statutes explicitly exempt "religious materials" from the definition of material support.  28 U.S.C. § 2339A(b)(1); § 2339B(g)(4) (adopting § 2339A's definition of material support).  Absent Kohlmann's testimony, there was no evidence that *39 Ways*, the lynchpin of the government's translation theory, was anything other than a mainstream religious text.  Kohlmann alone turned Mehanna's non-actionable translation of religious material into ev-

idence of provision of material support to al Qa'ida.

>    *e.*    *Without Kohlmann's Testimony Establishing a Tibyan Conspiracy with Al Qa'ida, the Government Could Not Have Criminalized Mehanna's Independent Advocacy.*

In its closing argument, the government argued at length that Mehanna's communications with local members of the Muslim community provided material support to al Qa'ida in the form of "one-on-one recruitment of others as personnel for al Qa'ida and terrorists."  Dkt. No. 419, 68:14–15, 66:15–68:13.  Without the connection to al Qa'ida provided only by Kohlmann, all of these activities are independent advocacy protected by the First Amendment.  *See HLP*, 561 U.S. at 39.

## 2.    Kohlmann Provided Uncorroborated Testimony Concerning Mehanna's State of Mind.

>    *a.*    *Kohlmann Testified that Mehanna Discussed "Martyrdom Operations" Using Al Qa'ida Code Words.*

The government argued that Mehanna relied on "coded language" in his communications with co-conspirators to "g[e]t him through the last ten years."  Dkt. No. 419, 141:21–23 (Gov. Closing); *see* Dkt. No. 408, 115:11–13 (explaining to the Court that Kohlmann could review Mehanna's words and "provide some perspective into these types of coded communications that are commonly made by jihadis.").  Kohlmann testified that "[a]mong jihadi extremists in general it is very common on the internet to use language substitutions[.]" Dkt. No. 410, 81:25–82:1; *id.* at 81:23–25 ("it is common amongst al Qa'ida and other terrorist groups"); *id.* at 82:3–7 (anyone "from the world of violent jihad" would "know the meaning").  He testified that Mehanna's communications contained code words that "*al Qa'ida frequently uses*."  *Id.* at 82:16–83:1.

Exhibit 549 was one example.  The government argued that the exhibit was "directly related to [Mehanna's] state of mind in this case and [] relevant to the charged offenses."  Dkt. No. 408, 108:22–109:2, 114:3–116:11.  In the exhibit, Mehanna and an Egyptian correspondent discuss a wedding.  Tr. Ex. 549.  Kohlmann testified that "wedding" is al Qa'ida code for "martyrdom operation":

> the word 'wedding' is one of the most frequently coded—or used
> in terms of coding by jihad extremists, by al Qa'ida … it's a code
> that refers to martyrdom, or martyrdom operation.  The idea behind
> this is that someone who's engaging in a martyrdom operation,
> they're expected to then wed the 72 virgins in paradise … The idea
> is you're getting married.  It's a wedding.  *So the word that ... al
> Qa'ida frequently uses to refer to martyrdom operations is 'wed-
> ding.'*

Dkt. No. 410, 82:8–83:1.  No other witness testified that al Qa'ida operatives use "wedding" as a

code word for "martyrdom operations."

The exhibit is dated July 27, 2006.  Tr. Ex. 549.  In August 2006, Mehanna's family at-

tended a wedding—that is, a ceremony of marriage between two persons—in Egypt.  *See* Dkt.

No. 408, 116:3–5.

b.      *Kohlmann Explained the Content of Files from Mehanna's Computer.*

In its summation, the government rested heavily on the content of Mehanna's computer.

Dkt. No. 419, 150:3–5 ("We showed you what was on the defendant's computer *before* he en-

gaged in these crimes or *while* he was engaging in these crimes"); *see* Dkt. No. 402, 85:22–86:3

(Gov.) (Mehanna's computer files were "all probative of what the defendant's state of mind is

and was during the relevant time of the conspiracy … when he was engaged in the acts we're

alleging.").

Kohlmann provided testimony—much of which was inflammatory—on the meaning or

context of *forty-nine* different exhibits.  Exhibit D catalogs uncorroborated testimony that Kohl-

mann provided on trial exhibits connected to Mehanna's computer, many of which were in Ara-

bic and could not be directly interpreted by English-speaking jurors.  While the materiality of

Kohlmann's testimony on each exhibit may be subject to debate when considered in isolation,

the sheer volume had significant impact.  For the same reason that the Court admitted the evi-

dence in the first place—that its volume had probative value, Dkt. No. 408, 104:6–12—Mehanna

submits that the Court should find that the volume of Kohlmann's uncorroborated testimony

makes *that* testimony material.

3.      **Kohlmann's Testimony Materially Influenced the Jury's Assessment of Mehanna's State of Mind, Which Was the Only Jury Question Concerning the Travel to Yemen.**

The core facts concerning Yemen were undisputed: that Mehanna travelled there, that he visited schools, that he did not engage in fighting or training, that he did not go on to Iraq, and that he came home of his own volition. *See* Tr. Ex. 795. The government's theory—that this trip represented a conspiracy or attempt to provide material support—hinged on Mehanna's state of mind. *See* Dkt. No. 399, 14:20–21 (Gov.) ("The defendant's state of mind is the central issue" in the case). Here, once again, the government turned to Kohlmann.

a.      *Evidence Supported a Non-Criminal Purpose for the Yemen Trip.*

"[N]o picture, video, book, or tract spoke directly to the defendant's purpose in going to Yemen[.]" *Mehanna*, 735 F.3d at 61. *Government* witnesses testified that Mehanna said he sought a school.[18] Dkt. No. 397, 108:11–109:9 (Masood) (Mehanna said he "had gone to a school in Yemen … spoke to scholars … [and] attended classes[.]" He went "to look at schools that he would study at in the future. … [H]e said that was the reason why he went to Yemen[.]"); Dkt. No. 391, 94:21–22 (Aboubakr) ("He told me that they had gone to a school to go learn in Yemen."); *see* Dkt. No. 401, 99:3–13 (Maldonado told the FBI in 2007 that Mehanna studied with a scholar in Yemen). Months prior to the trip, Abousamra (who did go on to Iraq) explained that there was no common scheme. He said he hoped friends from Boston would "accompany him" to Yemen, but "they're not in a position to go and train and to fight[.]" Dkt. No. 399, 50:11–17 (Pippin). Mehanna hoped one day to move to Yemen and "live around a scholar or the student of a scholar[.]" Dkt. No. 392, 150:20–151:18 (Aboubakr); *see e.g.* Tr. Ex. 610 (Mehanna discussing plans to "go study in Yemen" to "eat, pray, study" with "like, 300 other brothers").

---

[18] Yemen is "known as a place to go to study with particular shayks … [and] Muslims students from around the world often will travel to Yemen to study at some of the different institutes and schools there." Dkt. No. 413, 75:9–13. "It's particularity noted for the register of Arabic that's spoken there," and is recommended for Arabic study by the State Department and American professors. *Id.* at 74:11–75:8.

The defense also argued that the evidence showed that Mehanna's belief in the Islamic tenet of *aman* prohibited him from "harm[ing] the country" that permitted the practice of his faith, and therefore prohibited him from supporting al Qa'ida's primary mission. Dkt. No. 412, 131:19–22; Dkt. No. 403, 115:10–117:22. Citing religious doctrine, Mehanna argued against al Qa'ida's declaration that all American citizens were military targets, Dkt. No. 412, 52:20–24, Tr. Ex. 1006; contradicted the reported head of al Qa'ida in Yemen Anwar al-Awlaki, *id.* at 68:9–11, Tr. Ex. 1237; argued that al Qa'ida had no right to excommunicate and kill "apostates," Dkt. No. 414, 91:5–92:1, Tr. Ex. 1256; and denied al Qa'ida's view that any non-Muslim might be killed if found in Muslim lands, Dkt. No. 390, 16:2–24, Tr. Ex. 419. In short, Mehanna's interpretation of Islam forbade him from providing material support to al Qa'ida.

> **b.     Kohlmann's Testimony Overwhelmed the Defense Case and Swamped the Jury's Determination of Mehanna's Intent in Travelling to Yemen.**

To counter the defense case, the government relied on Kohlmann's credibility, using that credibility to argue for a general state of mind bent on criminal activity. Kohlmann furnished the opinion evidence that allowed the government to argue that:

- Mehanna was an administrator of an al Qa'ida website;

- Mehanna was an al Qa'ida operative who conspired to translate its propaganda;

- Mehanna produced the English version of an al Qa'ida terrorist training manual;

- Mehanna recruited local Muslims on behalf of al Qa'ida; and that

- Mehanna discussed preparations for an al Qa'ida suicide bombing with friends.

Few things could be more influential to a jury sitting in Boston.

As it stressed in its summation, the government offered its case on Mehanna's general state of mind to prove *all* counts of the indictment. "The charges," it said, "are all related to each other … the evidence proving these charges overlaps." Dkt. No. 419, 40:18–21 (Gov. Closing); *id.* at 41:23–24 ("the charges and evidence overlap"). It told the jury that "[w]hen the defendant returned from Yemen, he neither gave up his desire to fight jihad nor his desire to support al Qa'ida. He now did so in a different manner than on the front lines of battle," by providing

translations.  *Id.* at 65:11–14; Dkt. No. 386, 32:10–15 (Gov. Opening) (Mehanna's translations were intended to instruct others "on how somebody can get ready to personally get into the fight. … And after he failed in being able to do that himself over in Yemen, he wanted other people to do what he could not.").  Kohlmann was the government's central witness on Tarek Mehanna's state of mind—the *only* jury question on the Yemen theory.  On Kohlmann's credibility, the government staked its theory of a link to al Qa'ida.  Through that link, it urged the jury to find a criminal state of mind in the week-long trip to Yemen.

### 4.      Kohlmann Fortified the Testimony of Government Civilian Witnesses with Impaired Credibility.

The tendency of a key witness's testimony to impact the jury's assessment of other witnesses bears on the materiality of the government's failure to disclose impeachment evidence. *Drumgold v. Callahan*, 707 F.3d 28, 41 (1st Cir. 2013) (finding *Brady* violation where government withheld impeachment evidence concerning a key witness whose testimony was "crucial in connecting the accounts of other prosecution witnesses").  Kohlmann's testimony took on heightened significance where it reinforced the testimony of the government's lay witnesses, each of whom had serious credibility problems.

Kareem Abuzahra admitted that he was a practiced liar.  *See* Dkt. No. 408, 83:15–16 (Abuzahra) (lying is "a useful skill set to have"); *id.* at 60:1–19, 83:17–23 (had lied to FBI in the past); *id.* at 59:10–12 (would lie to the FBI "if it were in [his] best interest").  He "believe[d] that [his] choice" was to "either cooperate or be indicted," *id.* at 71:12–14, and testified pursuant to an immunity deal by which he avoided prosecution for admitted crimes, Dkt. No. 405, 112:14–114:19; Dkt. No. 408, 71:12–25.

Hassan Masood also testified under immunity.  Dkt. No. 397, 126:15–20.  He admitted that he lied in a notarized petition, *id.* at 114:24–116:6, and to a federal judge while under oath, *id.* at 119:23–120:10, 124:3–7, because he "want[ed] desperately to remain in the United States and not be deported," *id.* at 124:8–10.  At the time of trial, Masood was "an alien subject to deportation[.]"  *Id.* at 113:23–25.

At the time of trial, Daniel Maldonado was serving a ten-year sentence under a plea agreement, the terms of which required him to "take the stand in any cases" deemed necessary by the government.  Dkt. No. 401, 62:11–21.  If he breached the agreement, his sentence converted to life without parole, *id.* at 62:15–17, and he could be relocated to a distant facility where his three children would be unable to visit him, *id.* at 116:5–7.  By the terms of the agreement, the government alone determined when it was breached.  *Id.* at 124:9–24.  Absent Kohlmann's overwhelming influence on the trial, the jury might have credited the fact that, in *twenty-one* FBI interviews over four years and at Mehanna's grand jury, Maldonado never said that Mehanna travelled to Yemen for any reason other than to visit a school or mosque.  *Id.* at 110:17–111:3, 121:4–122:12.

Ali Aboubakr and Daniel Spaulding both testified pursuant to immunity deals as well.  Dkt. No. 391, 14:8–15:6; Dkt. No. 402, 128:12–129:5.  Spaulding avoided prosecution for same conduct for which Mehanna was tried.  Dkt. No. 403, 61:22–62:2; Dkt. No. 404, 46:12–48:5.  Aboubakr met with prosecutors for the first time after his grand jury testimony, from which he omitted details that he later remembered at trial.  Dkt. No. 392, 25:24–28:11, 30:10–31:15, 35:11–36:18, 47:13–48:12, 131:13–134:25.

The jury weighed the credibility of these young men against the backdrop of Kohlmann's expert testimony.  It is impossible to disentangle his testimony from theirs, nor to reconstruct, after the fact, how that testimony would have weighed against Mehanna's own contemporaneous statements, offered in chats and electronic communications before the fact, as to his non-martial state of mind.

### 5.     The Government's Failure to Disclose the Kohlmann Information Materially Impacted Defense Strategy.

A new trial can be warranted "where it is apparent [] that the defense strategy may have been determined by the failure to disclose[.]'"  *United States v. Mackin*, 793 F.3d 703, 711 (7th Cir. 2015) (quoting *United States v. Noe*, 821 F.2d 604, 607 (11th Cir. 1987); *see also King v. Ponte*, 717 F.2d 635, 644 (1st Cir. 1983) ("We recognize that a court should be wary of binding

the defense to a course chosen at trial in a vacuum created by the state's failure to disclose evidence.") (citing *Scurr v. Niccum*, 620 F.2d 186, 191 n.3 (8th Cir. 1980)); *United States v. Washington*, 294 F. Supp. 2d 246, 250 (D. Conn. 2003) (government's failure to disclose impeachment material for key government witness affected defense counsel's ability to "plan his overall trial strategy" warranting a new trial).

Mehanna filed and, unaware of the *Giglio* material, later withdrew, on the basis of a scope limitation, a *Daubert* motion to preclude Kohlmann's testimony altogether. *See* Dkt. No. 342; Dkt. No. 408, 149:6–10.[19] This compromise—a sensible judgment in light of what trial counsel knew—opened the door to Kohlmann's opinions, discussed above, and to the foundation he provided that allowed the admission of what otherwise would have been inadmissible hearsay. For example, the Tsouli/Mughal chat regarding the request from "AQ IN IRAQ," Tr. Ex. 378, and the Muraabit message forwarding the request from the "cloud people," Tr. Ex. 427, both appear to have been admitted under the co-conspirator exception to the hearsay rule. Dkt. No. 389, 76:7–79:18; *see* Dkt. No. 395, 74:5–13 (Gov.).[20] Without Kohlmann, there was no independent evidence that Mehanna conspired with any of these people to support al Qa'ida. The only documentary evidence in the case connecting *anybody* to al Qa'ida would have been rendered inadmissible.

After thirty exhausting trial days, Ms. Bassil said, "All of our defense focused in response to Mr. Kohlmann." Dkt. No. 413, 14:15–16. Later, she added, "The Court has always known that our experts were based on what Kohlmann was going to say[.]" Dkt. No. 414, 22:2–3. Nei-

---

[19] The motion was filed under seal on or about October 17, 2011, and does not appear on the public docket. *See* Dkt. No. 408, 141:11–149:11 (hearing on motion to exclude Kohlmann). The government's response was publicly filed on November 7, 2011. Dkt. No. 342

[20] The admissibility of these exhibits was argued and decided under seal. *See* Dkt. No. 273, 288; March 2, 2012 Sealed Entry. But Kohlmann's testimony provided the only basis for their admission under the co-conspirator exception to the hearsay rule. *See* Dkt. No. 389, 77:12–13 (Gov.) ("Part of the request [in Tr. Ex. 427] is by a coconspirator."); *id.* at 78:13–17 (Court) ("[T]he government is offering [Tr. Ex. 427] as proof of work of the conspiracy."); Dkt. No. 395, 74:12–13 (Gov.) (Tr. Ex. 378 is "relevant … to the conspiracy which the defendant joined").

ther Ms. Bassil nor the Court had seen the *Giglio* material, but the defense had launched a *Daubert* challenge.  The hallmark of the *Daubert* standard is "evidentiary reliability—that is, trustworthiness."  *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 n.9 (1993).  With that material, might the defense team have excluded Kohlmann altogether?[21]  Mehanna submits that neither Mehanna's counsel nor the Court can fully address this question without seeing what the government withheld from his trial counsel.  Whatever the answer, the government's failure to disclose the material significantly influenced the conduct of the trial.

## IV.    CONCLUSION

For the foregoing reasons, Mehanna respectfully requests that his motion be allowed.

Respectfully submitted,

**TAREK MEHANNA**

By His Attorneys,

*/s/ Julie Silva Palmer*
Sabin Willett, BBO #542519
*sabin.willett@morganlewis.com*
Julie V. Silva Palmer, BBO #676788
*julie.palmer@morganlewis.com*
Amanda V. McGee, BBO #678883
*amanda.mcgee@morganlewis.com*
Rhonda J. Yacawych, BBO #560183
*rhonda.yacawych@morganlewis.com*
Arcangelo S. Cella, BBO #690438
*arcangelo.cella@morganlewis.com*
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA  02110-1726
617-951-8000

Dated:  September 25, 2015

---

[21] Mr. Dratel himself, as counsel in *Hasbajrami*, filed a *Daubert* motion regarding Kohlmann, which evidently relates to the Kohlmann Information.  Dratel Decl. ¶ 13.  Because the motion contained classified information, undersigned counsel do not have access to it.  The defendant changed his plea before a ruling on the motion.

**CERTIFICATE OF SERVICE**

I, Julie V. Silva Palmer, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 25, 2015.

*/s/ Julie Silva Palmer*
Julie V. Silva Palmer